IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN R. LAYMON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-169 |
| | ) | Judge Nora Barry Fischer |
| BOMBARDIER TRANSPORTATION (HOLDINGS) USA, INC, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

## I. Introduction

This is a *qui tam* action brought by Plaintiff John R. Laymon, Jr. ("Plaintiff") on behalf of the United States of America, the state of California, and the San Francisco Bay Area Rapid Transit District ("BART") against Defendant Bombardier Transportation (Holdings) USA, Inc., formerly known as Adtranz, and Bombardier, Inc. (collectively "Bombardier") for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-33, and the California False Claims Act, Cal. Gov. Code § 12650, *et. seq.* Currently pending before the Court is Bombardier's Motion for Summary Judgment (Docket No. 45). For the reasons set forth herein, this Court **DENIES** Bombardier's Motion for Summary Judgment. (Docket No. [45]).

## II. Factual Background

### A. Local Rule 56.1 Violation

Before addressing the facts pertinent to the instant matter, the Court notes that Bombardier

has violated Rule 56.1(c) of the Local Rules of this Court ("L.R. 56.1(c)").[1] In support of its motion, Bombardier filed a Concise Statement of Undisputed Material Facts. (Docket No. 47). Plaintiff filed its Response to Bombardier's Statement of Undisputed Facts and a Counterstatement of Material Facts. (Docket No. 53).[2] Defendant has failed to respond to the additional facts alleged by Plaintiff in his Counterstatement of Material Facts. (Docket No. 53 at 12-19). Local Rule 56.1(E) sets forth the consequences for failure to comply with L.R. 56.1(c) as follows:

> alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Response to Defendant's Concise Statement of Material Facts, which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

W.D. Pa. L.R. 56.1(E)(2008). Therefore, for the purposes of the instant motion, the facts as stated in Plaintiff's Counterstatement of Material Facts (Docket No. 53 at 12-19) are deemed admitted by Bombardier, in accordance with Local Rule 56.1(E). *See Janokowski v. Demand*, Civ. A. No. 06-

---

1

Rule 56.1(c)(1) of the Local Rules of the United States District Court for the Western District of Pennsylvania mandates that the opposing party's response to a motion for summary judgment include: A separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:

(a) admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;

(b) setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (*See* L.R. 56.1(b)(1) for instructions regarding format and annotation);
***and***

(c) setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the court to determine the motion for summary judgement[.]

W.D.Pa.L.R. 56.1(c)(1)(2008) (emphasis added).

2

Plaintiff's Response to Bombardier's Statement of Undisputed Facts and Counterstatement of Material Facts was originally filed at Docket No. 50; however, as said document was filed incorrectly, it was removed from view at Docket No. 50, and re-filed at Docket No. 53. (*See* Docket Nos. 50 and 53).

618, 2008 U.S. Dist. LEXIS 34196, at *3 (W.D.Pa. April 25, 2008); *GNC Franchising LLC v. Kahn,* Civ. A. Nos. 05-1341; 06-238, 2008 U.S. Dist. LEXIS 16046, at *3 (W.D.Pa. Mar. 3, 2008); *Ferace v. Hawley*, Civ. A. No. 05-1259, 2007 U.S. Dist. LEXIS 71437, at *2 (W.D.Pa. Sept. 26, 2007) (citing *Benko v. Portage Area Sch. Dist.*, Civ. A. No. 03-233J, 2006 U.S. Dist. LEXIS 40573 (W.D.Pa. June 19, 2006)).

The Court has gleaned the following relevant factual background from the parties' summary judgment filings.

**B. The Parties**

Plaintiff, John R. Laymon, Jr., is an adult individual from Allegheny County, Pennsylvania and the owner of JRL Enterprises, Inc. ("JRL"), a corporation with its principal place of business in Pittsburgh, Pennsylvania. (Docket No. 31 at ¶ 1; Docket No. 47 at ¶ 20). JRL is engaged in the business of reconditioning rail car motors used in transit systems and at all times relevant hereto was certified as a Minority Business Enterprise ("MBE") and Disadvantaged Business Enterprise ("DBE") within the meaning of 13 C.F.R. § 124.105(d) and 49 C.F.R. Part 26.[3] (Docket No. 31 at

---

3

A DBE is defined as a for-profit small business that is (1) at least 51 % owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51% of the stock is owned by one or more such individuals; and (2) whose management and daily business operations are controlled by one or more socially and economically disadvantaged individuals who own it. 49 C.F.R. § 26.5. A socially and economically disadvantaged individual means any individual who is a citizen of the United States and who is determined to be socially and economically disadvantaged. *Id.* The regulations provide a list of ethnicities that are rebuttably presumed to be socially and economically disadvantaged. *See id.* Additionally, one may be found to be disadvantaged by the Small Business Administration at such time as the Administration designates. *Id.*

In order to be classified as being unconditionally owned by one or more disadvantaged individuals, a corporation must have at least 51% of each class of its voting stock outstanding and 51 % of the aggregate of all stock outstanding must be unconditionally owned by one or more individuals determined by the Small Business Administration to be socially and economically disadvantaged. 13 C.F.R. § 124.105(d). The objectives of the federal DBE program, found at 49 C.F.R. 26.1, include some of the following: (1) to ensure nondiscrimination in the award and administration of DOT-assisted contracts in the Department's highway, transit, and airport financial assistance program; (2) to create a level playing field on which DBEs can compete fairly for DOT-assisted contracts; (3) to help remove barriers to the participation of DBEs in DOT-assisted contracts; (4) to assist the development of firms that can compete successfully in the marketplace outside the DBE programs; and (5) to provide appropriate flexibility to recipients of Federal financial

¶ 1; Docket No. 47 at ¶¶ 20-21; Docket No. 53 at ¶ 89). Defendant Bombardier Transportation (Holdings) USA, Inc. is a Delaware Corporation with a place of business in West Mifflin, Pennsylvania. (Docket No. 31 at ¶ 2). Defendant Bombardier, Inc. is a corporation headquartered in Montreal, Province of Quebec, Canada. (*Id.* at ¶ 3). It owns and controls Bombardier Transportation. (*Id.*).

**C. The BART - Bombardier Contract**

On April 7, 1995, Bombardier and BART entered into Contract No. 41 MF-110A wherein Bombardier agreed to renovate BART's transit vehicles and install new motors. (Docket No. 47 at ¶¶ 1, 16; Docket No. 53 at ¶¶ 1, 16). The contract was funded in part by the United States Federal Transit Administration ("FTA"). (Docket No. 47 at ¶ 2; Docket No. 53 at ¶ 2). This funding was allocated to the project but not provided to BART prior to performance on the project and invoicing for work. (Docket No. 31 at ¶ 9). Bombardier, as a contractor on the FTA-funded project, was required to certify that it had complied with the United States Department of Transportation's ("DOT") DBE program, specifically the requirements of 49 C.F.R. Part 26 relating to the participation of DBEs on the project. (Docket No. 47 at ¶ 3; Docket No. 53 at ¶ 80). The project was also funded by the state of California, thus Bombardier was also required to certify to BART and California that it had complied with California law relating to MBE/DBE participation. (Docket No. 31 at ¶ 10).

The purpose of this program is to ensure that DBEs have the opportunity to participate in BART contracts that are federally funded. (Docket No. 53 at ¶ 81). BART and DOT worked together throughout the course of the project to monitor DBE participation and compliance. (*Id.* at

---

assistance in establishing and providing opportunities for DBEs. 49 C.F.R. § 26.1

¶ 82). Pursuant to paragraph 7.13B of the BART contract, the DBE participation goal (the "goal") for the project was 16 % of the base contract amount. (Docket No. 47 at ¶ 4; Docket No. 53 at ¶ 4). The base contract amount was $330,045,952.00, therefore the DBE participation goal was $52,807,352. (*Id.* at ¶ 5). The contract originally involved the rehabilitation of 200 of BART's transit vehicles but after the contract was amended by change orders, a total of 439 transit cars were to be renovated. (*Id.* at ¶¶ 6-7). Therefore, Plaintiff contends that the DBE participation goal would have been expanded in proportion to the increase in the contract value and in accordance with subsequent change orders. (Docket No. 53 at ¶ 5).

During the course of the project, Steven Proctor, a BART project manager, was responsible for the DBE program. (Docket No. 47 at ¶¶ 36-37; Docket No. 53 at ¶¶ 36-37). He was required to personally investigate any claim or protest as to DBE compliance. (*Id.* at ¶¶ 38-40). The DBE reports submitted by Bombardier were audited and reviewed monthly by BART's office of civil rights to ensure their validity. (*Id.* at ¶ 43-45). Donald Deemer was BART's senior civil rights officer who was responsible for monitoring the overall DBE participation on the project. (*Id.* at ¶ 48). Martin Matvey, a project manager for Bombardier, and Susan Presley, a project manager for BART, reviewed the invoices submitted by Bombardier for payment in connection with the contract. (*Id.* at ¶ 65). Mr. Matvey executed a majority of the invoices that were submitted to BART for payment. (*Id.* at ¶ 66).

Pursuant to Section P9 of the contract, Bombardier was to be paid for its work, excluding change orders, on a unit price/percent complete basis at a unit price of $668,483.00 per vehicle, excluding engineering, tooling, testing and spare parts. (Docket No. 47 at ¶¶ 8-9; Docket No. 53 at ¶¶ 8-9). Bombardier was permitted to bill BART for a certain portion of the unit price for its base

scope of work at various levels of completion as set forth in the contract. (*Id.* at ¶¶ 10-11). Bombardier's actual costs, including costs expended by its own forces or through subcontractors and/or material suppliers, were irrelevant to the amount that it could invoice BART. (*Id.*).

As part of the DBE program and pursuant to the contract, Bombardier was required to submit monthly DBE utilization reports to BART beginning in January of 1996, however, prior to the submission of the first report, BART notified Bombardier on December 12, 1995 of a few modifications to the report. (*Id.* at ¶¶ 12-13; Docket No. 53 at ¶ 12-13, 87).[4] Bombardier made the modifications to the DBE reports as suggested by BART. (*Id.* at ¶ 14). The monthly reports were to include the amounts awarded to DBEs as well as the cumulative amounts actually paid during each month. (Docket No. 53 at ¶¶ 83, 98). It was understood between BART and Bombardier that the monthly DBE reports submitted with each invoice were to be accurate and that BART was entitled to rely on them as being so. (Docket No. 53 at ¶¶ 92-93, 107-108). Upon receipt of the reports, BART would forward them to DOT to allow DOT to evaluate DBE participation and compliance with federally funded contracts. (*Id.* at ¶ 84). Thus, Bombardier was required to submit monthly DBE reports regardless of whether the DBE goal had been met because BART and DOT use these reports to evaluate the success of the DBE program on a contract-by contract basis and on a district and nationwide level. (*Id.* at ¶¶ 87-88).

Bombardier contends that, so long as BART certified a supplier or subcontractor as a DBE at the time Bombardier contracted with it, Bombardier could count that DBE's participation against the goal even if that DBE became subsequently decertified. (Docket No. 47 at ¶ 15). However,

---

4

As discussed above, given Bombardier's failure to respond appropriately to Plaintiff's Counterstatement of Material Facts (Docket No. 53 at 12-19), the facts asserted therein by Plaintiff are deemed admitted and are relied upon by this Court in making its rulings.

Plaintiff states if a DBE became decertified and remained so, Bombardier was not allowed to count that enterprise's participation towards the goal. (Docket No. 53 at ¶ 15).

As part of the subject BART contract, Bombardier guaranteed that the rail cars would function and be free of defects upon delivery, and thus, Bombardier could only invoice BART for completed, functioning cars but it could bill BART for a certain portion of the unit price at various levels of completion. (Docket No. 47 at ¶¶ 9-10; Docket No. 53 at ¶¶ 73-74). If defects were found in the motors, it was Bombardier's responsibility to correct them in order for the project to be considered complete and before Bombardier could invoice BART for payment of the unit price. (Docket No. 53 at ¶ 59-60). That is, Bombardier would not be entitled to payment for cars that were found to have problems or it was required to repair those cars if it had already been paid by BART for them pursuant to the fleet defect provision in the BART contract. (*Id.* at ¶¶ 63-63). Upon receipt of Bombardier's invoices for completed cars, BART would then submit requests for reimbursement to the FTA through a method called "Echo Payment Request." (*Id.* at ¶ 78-79). The FTA would then process those requests to authorize reimbursement to BART upon review and reliance on the information in the requests. (*Id.*).

**D. The Bombardier - JRL Relationship**

In early 2001, after Bombardier had renovated and been paid for many of the cars, BART issued a fleet defect notice to Bombardier regarding problems with the new motors. (Docket No. 47 at ¶ 17-18; Docket No. 53 at ¶¶ 17-18, 61). Bombardier accepted responsibility for the motor problems and thereafter contracted with JRL, DBE certified by BART, to perform the reconditioning work on the defective motors. (Docket No. 47 at ¶ 19; Docket No. 53 at ¶¶ 72, 89). Plaintiff contends that JRL also performed work on rail cars that had yet to be delivered to BART to ensure that defects

that had been found in other already shipped cars were not replicated. (Docket No. 53 at ¶ 72). Once the defects were corrected and BART had possession of fully functioning rail cars, Bombardier was then entitled to payment. (Docket No. 53 at ¶¶ 74-75). Bombardier states that it could not seek reimbursement from BART for the work that JRL did on repairs. (Docket No. 47 at ¶ 61). While this is undisputed, Plaintiff highlights the fact that Bombardier was required to repair the motors pursuant to the contract's fleet defect provision before it could be paid the full unit price. (Docket No. 47 at ¶ 61; Docket No. 53 at ¶ 61, 72). At the time of the repair work, Bombardier had already been paid by BART for many of the vehicles; as a result, Bombardier could not invoice BART for payments made to JRL, but was still required to repair the motors before receiving the full unit price. (*Id.* at ¶¶ 63-64).

As JRL's involvement with the BART contract and work on the defective motors began in March of 2001, Bombardier could thereafter include JRL's participation on the contract in the overall DBE goal. (*Id.* at ¶¶ 22, 25, and 26). From September of 2001 through November of 2002, Bombardier submitted the required DBE status reports to BART certifying the amount that JRL has been awarded and paid. (Docket No. 53 at ¶¶ 90-91).

**E. Bombardier's DBE Reports**

Bombardier issued its first DBE utilization report in January of 1996 with an award total of $54,155,905 to DBE firms, which exceeded the 16% goal of $52,807,352, however, it is unclear to the Court whether this amount reflected the increased value of the contract due to change orders. (Docket No. 47 at ¶ 24; Docket No. 53 at ¶ 24). In March of 2001, when JRL became involved, Bombardier had already exceeded the 16% goal, before change orders, with a planned award amount of $63,450,542 and a cumulative amount paid of $53,877,010 to DBEs. (Docket No. 47 at ¶ 27;

Docket No. 53 at ¶ 27). However, Plaintiff points out that the largest DBE utilized by Bombardier, Mindseed Corporation, had been under investigation and had been previously decertified. (Docket No. 53 at ¶ 27). Bombardier's July 2001 report indicated a cumulative award amount of $70,318,897 and amount paid of $64,387,797. (Docket No. 47 at ¶ 28; Docket No. 53 at ¶ 28). As indicated above, JRL first appears on Bombardier's DBE utilization reports in September of 2001. (*Id.* at ¶¶ 26, 29).

The final report submitted by Bombardier in November of 2002 reflects that Bombardier exceeded the goal of the original contract value with a cumulative amount paid to DBEs of $97,601,764.[5] (*Id.* at ¶¶ 31, 53). On this report, Bombardier listed JRL's planned award amount at $3,378,296, however, JRL was only paid $981,251. (*Id.* at ¶¶ 32-33, 54). Plaintiff contends that the planned award amount included not only the $981,251 paid to JRL but also the cost of equipment purchased directly by Bombardier, despite the fact that Bombardier knew that only labor and materials paid for by the DBE were to be included. (Docket No. 47 at ¶ 34; Docket No. 53 at ¶¶ 34, 96-97). The report does not list any amount actually paid to JRL, but Plaintiff attests that Bombardier did represent to BART that it had paid JRL in excess of $981,251. (*Id.* at ¶ 35).

On each DBE report Bombardier submitted between September of 2001 and November of 2002, when JRL was included as DBE on the project, Bombardier overstated the amounts awarded and paid to JRL, with that amount rising and falling without explanation. (Docket No. 53 at ¶¶ 94-95, 100). Bombardier has acknowledged that the final DBE report submitted to BART was overstated by $2,397,045 ($3,378,296 - $981,251); hence, Bombardier actually paid DBE

5 Again, it is unclear to the Court whether this figure incorporates the increase in the contract's value due to change orders. (Docket No. 47 at ¶ 69; Docket No. 53 at ¶ 46).

subcontractors and suppliers $95,204,719 ($97,601,764 - $2,397,045). (*Id.* at ¶ 54). It is, therefore, undisputed that Bombardier met its DBE project goal of 16% for the original contract value, however, it is unclear whether the amount paid to DBEs reflects the contract expansion due to change orders. (Docket No. 47 at ¶ 55; Docket No. 53 at ¶ 55). According to the BART contract, approval of payments to Bombardier was conditioned upon the accuracy of Bombardier's DBE utilization reports. (Docket No. 53 at ¶ 109). Accordingly, BART used the overstated amount attributed to JRL in determining whether Bombardier had met its DBE goals and also used that information in its reports to DOT. (*Id.* at ¶¶ 105-106).

Bombardier maintains that Donald Deemer, BART's civil rights officer monitoring DBE participation, became aware of the mistake as to JRL in 2004; however, Plaintiff disputes this fact and contends that Mr. Deemer did not become aware of Bombardier's overstatement until this litigation commenced and the matter was unsealed. (Docket No. 47 at ¶ 49; Docket No. 53 at ¶ 49). Plaintiff also contends that Mr. Deemer did not conduct an investigation into Bombardier's alleged false statements but did request further information from JRL concerning the same. (*Id.* at ¶ 50). Plaintiff then argues that Bombardier took no steps to verify the accuracy of the DBE reports before submitting them. (Docket No. 53 at ¶ 102). Specifically, Plaintiff asked Bombardier employee, Jacqueline Simms, who was responsible for certifying the DBE reports to BART, to provide information regarding contracts pursuant to which Bombardier reported DBE information on JRL; however, Ms. Simms refused to do so. (Docket No. 47 at ¶ 56; Docket No. 53 at ¶¶ 56, 103). Plaintiff also asserts that Bombardier has yet to correct the false reports it made to BART concerning JRL's participation on the project. (Docket No. 53 at ¶ 104).

## III. Procedural History

On April 14, 2005, Plaintiff commenced this action under seal [6] by filing a *qui tam* Complaint against Bombardier in order to recover statutory penalties and civil damages pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729-33[7] and the California False Claims Act, Cal. Gov. Code § 12650, *et. seq.*[8] (Docket No. 1). The United States of America investigated Plaintiff's claims but declined to intervene on March 17, 2006. (Docket No. 10). Thereafter, on September 11, 2006, Bombardier filed a Motion to Dismiss the *qui tam* Complaint and Brief in Support.[9] (Docket Nos. 17 and 18). Plaintiff filed his Brief in Response on October 2, 2006 (Docket No. 20), and Bombardier filed its Reply on October 11, 2006. (Docket No. 21). During a telephonic status conference held before Judge Thomas M. Hardiman on March 15, 2007, the Court granted Bombardier's Motion to Dismiss without prejudice, allowing Plaintiff 90 days for limited discovery

---

6

The United States of America thereafter filed numerous motions to extend the seal period and deadline for notification of its intent to intervene, which the Court granted thereby extending the seal period up through March 17, 2006, on which date the United States filed its Notice of Election to Decline Intervention. (Docket Nos. 3-10). On April 3, 2006, the Court unsealed Plaintiff's Complaint. (Docket No. 11).

7

See discussion *infra*, at Section V, pp. 15-16.

8

The California False Claims Act provides a person will be liable to the state of California for three times the amount of damages which the state, or a political subdivision, sustains plus costs of a civil action brought to recover such damages in addition to damages of not less than $5,000 but not more than $10,00 for each false claim which may include, *inter alia*, the following:

> (1) knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision; or (3) conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or any political subdivision.

Cal. Gov. Code § 12651(a)(1) - (3)(2007).

9

Bombardier's responsive pleading was originally due on June 26, 2006 but that deadline was first extended to August 10, 2006 by the parties' stipulation (Docket No. 14), and then again until September 11, 2006 upon the Court's granting of a Motion for Extension of Time by Bombardier. (Docket Nos. 15 and 16, respectively).

and to file an amended complaint, if he so chose, on or before June 13, 2007.[10] (Docket Nos. 23 and 24).

On May 10, 2007, Plaintiff filed a Motion for Extension of Time to Complete Discovery and File an Amended Complaint. (Docket No. 26). On May 16, 2007, this Court held a status/settlement conference during which it granted said motion and extended discovery up and through July 30, 2007, allowing Plaintiff until August 13, 2007 to file his amended complaint. (Docket Nos. 27 and 28). Upon the Court's granting of another motion by Plaintiff filed on July 12, 2007, discovery was extended again until August 29, 2007, Plaintiff was granted until September 12, 2007 to file an amended complaint, and BART was directed to provide documents responsive to Plaintiff's subpoenas no later than July 25, 2007. (Docket Nos. 29 and 30).

On September 11, 2007, Plaintiff filed his Amended *qui tam* Complaint against Bombardier. (Docket No. 31). Thereafter, the Court held another status/settlement conference on September 26, 2007, during which the parties advised the Court that limited discovery had been completed and that they had stipulated that Bombardier would file a responsive pleading by October 26, 2007. (Docket Nos. 32 and 33). Additionally, the Court discussed with the parties and their counsel the potential resolution of the matter and the possibility of ADR. (*Id.*). Thereafter, Bombardier filed its Answer and Affirmative Defenses on October 26, 2007. (Docket No. 34).

On November 16, 2007, the Court referred this case to mediation before James H. McConomy, Esquire. (Docket No. 35). The parties' ADR conference was held on December 27, 2007, however, settlement was not reached. (Docket No. 39). On January 3, 2008, the Court held a

10 This matter was reassigned to the undersigned Judge on April 6, 2007 following the elevation of Judge Thomas M. Hardiman to the United States Court of Appeals for the Third Circuit.

status conference with counsel for the parties wherein amended case management deadlines were set. (Docket No. 41). Discovery was set to end on July 7, 2008, however on June 5, 2008, Plaintiff filed an Unopposed Motion for Extension of Time to Complete Discovery. (Docket No. 42). The Court held a telephone status conference with counsel for the parties on June 6, 2008 wherein counsel apprised the Court of the reasons for extending discovery. (Docket No. 43). For good cause shown, the Court granted the motion (Docket No. 42) thereby extending discovery until November 7, 2008. (Docket No. 43). The Court also entered an amended case management order making all summary judgment motions due by December 8, 2008. (Docket No. 44).

On November 18, 2008, Bombardier filed its Motion for Summary Judgment with Appendix and Brief in Support thereof as well as its Concise Statement of Material Facts. (Docket Nos. 45, 46, and 47). Plaintiff filed his Brief in Opposition, Response Appendix, Response to Bombardier's Statement of Undisputed Facts, and Counterstatement of Undisputed Facts on January 8, 2009. (Docket Nos. 48, 49, and 53). As the instant motion has been fully briefed by the parties, it is now ripe for disposition.

## IV.    Legal Standard

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary

judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).

A dispute of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 412 F.3d at 249. As to materiality, the relevant substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

"The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment." *Turner v. Leavitt*, Civ. A. No. 05-942, 2008 WL 828033, at *4 (W.D.Pa. Mar. 25, 2008) (citing *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10 WRIGHT AND MILLER, FEDERAL PRACTICE § 2721, at 40 (2d ed.1983))); *Pollack v. Newark*, 147 F.Supp. 35, 39 (D.N.J.1956), *aff'd*, 248 F.2d 543 (3d Cir.1957), *cert. denied*, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). However, the court must not engage in credibility determinations at

the summary judgment stage. *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir.1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir.1994)).

## V. Discussion

Plaintiff claims that Bombardier violated the federal False Claims Act, specifically 31 U.S.C. § 3729(a)(1) and (2), because it presented DBE reports to BART with overstatements of the amount of work awarded to JRL and amounts paid to JRL for JRL's work on the rehabilitation of rail car motors. The civil False Claims Act ("FCA") provides, in relevant part:

> (a) Liability for certain acts. Any person who --
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> ...
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.[11]

31 U.S.C. § 3729(a)(1)-(2); *see also United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009). A suit to enforce liability thus created under the statute may be instituted in two ways:

> The United States Department of Justice may file suit to collect damages as the result of fraudulent claims which cause government money to be expended from the United States Treasury.

---

11 The minimum and maximum penalties were changed to $5,500 and $11,000 respectively, effective August 30, 1999. *See* 28 C.F.R. § 85.3(a)(9)(2007).

> Alternatively, a private plaintiff may bring a *qui tam* action on behalf of the government to recover losses incurred because of fraudulent claims. When a private plaintiff brings a *qui tam* action, the government is permitted to intervene. But the private plaintiff may continue his suit even if the government declines to intervene. If the *qui tam* suit is ultimately successful, the private plaintiff, known as a relator, is entitled up to 30 % of the funds the government recovers.

*Hutchins v. Wilentz*, 253 F.3d 176, 181-82 (3d Cir. 2001), *cert. denied*, 536 U.S. 906 (2002)(citing 31 U.S.C. § 3730(b), (c), and (d)). Here, the United States declined to intervene (*see* Docket No. 10) and, accordingly, Plaintiff is proceeding as a *qui tam* relator.[12]

In order to successfully assert a claim[13] under section 3729(a) of the statute, a plaintiff must establish the following:

> (1) that the defendant made a false statement or engaged in a fraudulent course of conduct;
> (2) such statement or conduct was made or carried out with the requisite scienter;
> (3) the statement or conduct was material; and
> (4) the statement or conduct caused the government to pay out money or to forfeit money due.

*United States ex. rel. Sanders v. N. Am. Bus Indus.*, 546 F.3d 288, 297 (4th Cir. 2008)(citing *Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003)). In order to prove this claim, a plaintiff must establish that the defendant made or used a false record in order

---

12

*Qui tam* is short for "qui tam pro domino rege quam pro se ipso in hac parte sequitur," which means "who as well for the king as for himself sues in this matter." BLACK'S LAW DICTIONARY (8th ed. 2004)(Online edition); *see also Rockwell Int'l. Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007).

13

The Act defines a claim as:

> [A]ny request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c).

to cause the claim to be actually paid by the government. *United States ex rel. Schmidt v. Zimmer Inc., et al.*, 386 F.3d 235, 242 (3d Cir. 2004)(citation omitted). The United States Court of Appeals for the Third Circuit has recognized that a plaintiff may assert a FCA cause of action when an intermediary, such as BART in the instant case, is merely a conduit to the transfer of government funds because it is reimbursed by the federal government. *Hutchins*, 253 F.3d at 185 (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968); *United States v. Bornstein*, 423 U.S. 303, 309 (1976); and *United States v. Ueber*, 299 F.2d 310, 313 (6th Cir. 1962)); *see also United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 493 (D.C. Cir. 2004); and *U.S. DOT ex rel. Arnold v. CMC Eng'g.*, Civ. A. No. 03-1580, 2007 U.S. Dist. LEXIS 9118, at *15 (W.D. Pa. Feb. 7, 2007). Therefore, the proper inquiry is whether the defendant made a false claim or statement that caused or would cause the United States Treasury to pay funds. *Hutchins*, 253 F.3d at 185.[14] Since in the instant case the claims at issue are statements and records, the inquiries under section 3729(a)(1) and (2) are coterminous.

**A. False or Fraudulent Claim**

With regards to the False Claims Act, the phrase "false or fraudulent" is construed broadly, thus, any time a false statement is made in a transaction involving the United States Treasury, False Claims Act liability may attach. *United States ex rel. Longhi v. Lithium Power Techno.*, 513

---

14 While the parties have not raised this issue, the Court notes that district courts in the Third Circuit, including the Western District of Pennsylvania, have cited *Mikes v. Straus*, 274 F.3d 687 (2nd Cir. 2001) in support of the concept of FCA liability for false certification of compliance with federal regulations. *See In re Genesis Health Ventures, Inc.*, 272 B.R. 558, 569-70 (Bankr. D. Del. 2002); *United States ex rel. Cooper v. Gentiva Health Servs., Inc.*, Civ. A. No. 01-508, 2003 U.S. Dist. LEXIS 20690 (W.D. Pa. Nov. 4, 2003); *United States ex rel. Watson v. Connecticut Gen'l Life Ins. Co.*, Civ. A. No. 98-6698, 2003 U.S. Dist. LEXIS 2054 (E.D. Pa. Feb. 11, 2003). These decisions stand for the proposition that a plaintiff may bring a False Claims Act cause of action when a defendant has falsely certified compliance with a regulation, which such certification was a condition to payment. *Ab-Tech Constr. v. United States*, 31 Fed. Cl. 429, 434 (Fed Cl. 1994); *Mikes*, 274 F.3d at 699.

F.Supp.2d 866, 874 (S.D. Tex. 2007)(citation omitted). In the simplest terms, a false claim is "[a]n assertion or statement that is untrue." BLACK'S LAW DICTIONARY 636 (8th ed. 2004). Therefore, the inquiry becomes whether the claims or statements were literally true. Here, the parties do not dispute whether the DBE reports were factually correct. Bombardier has admitted that they were indeed not true. (Docket No. 47 at ¶¶ 32-34, 54). Instead, Bombardier argues that Plaintiff has failed to establish that it made a false or fraudulent claim to BART and the FTA and that any alleged false claim was not material to the government's decision to pay. (Docket No. 46 at 11-13).

Bombardier does not dispute that its DBE utilization reports to BART for September of 2001 through November of 2002 contained an inflated and incorrect planned award amount, cumulative award amount, and cumulative award amount paid attributed to JRL.[15] (*Id.* at 13). However, Bombardier attests that it made no attempt to take credit for JRL's participation in the overall 16 % goal as it "purposefully left blank" JRL's contribution to the percentage of the total plan achieved on each of the 15 reports submitted to BART. (*Id.*). Further, it exceeded that DBE contract goal of 16 % before JRL began any work on the rail cars. (*Id.*). As such, Bombardier argues that it made no representation that JRL's participation was being used to reach the contractual DBE goal for the project and Plaintiff's claim must fail. (*Id.*).

In response, Plaintiff first highlights that in Bombardier's repeated assertions that it met the DBE goal, it fails to disclose whether the DBE participation figures submitted to BART reflected the increased value of the contract due to numerous change orders. (Docket No. 48 at 7; Docket No. 47 at ¶ 69). Therefore, while Plaintiff believes that Bombardier's overall compliance with the DBE

---

15

Specifically, as laid out above, Bombardier overstated JRL's figure as being $3,378,296, instead of the correct amount of $981,251, inflating that figure by $2,397,045. (Docket No. 53 at ¶ 54).

program to be irrelevant to the instant matter, there is a genuine question of material fact with regards to Bombardier's overall DBE compliance. (Docket No. 48 at 7, n.1). The Court agrees for the following reasons. First, Bombardier's reporting obligations were mandatory and under no instance was it permissible to submit false DBE numbers. (*Id.* at 9). Second, Bombardier's contention that it did not take credit for JRL's work and thus no false report was made is directly contradicted by BART's civil rights officer Mr. Deemer's testimony that BART used the overstated figures in determining whether Bombardier had met its DBE goals. (Docket No. 48 at 10; Docket No. 53 at ¶ 105). Mr. Deemer specifically stated that BART added the amounts reported to arrive at a cumulative total for the project, including the inflated numbers as to JRL. (*Id.*). This divergent evidence creates a genuine issue of material fact as to whether JRL's payment was included in Bombardier's overall DBE figures.

Third, Plaintiff has put forth evidence establishing that Bombardier's right to payment was conditioned upon its submission of accurate monthly DBE reports regardless of the percentage of the goal attained. (Docket No. 48 at 8; Docket No. 53 at ¶¶ 107-110). While Bombardier has not responded to this contention, there is evidence that BART and DOT relied on this information to monitor district-wide and national DBE efforts. (*Id.*). Had BART and DOT been aware that Bombardier's reports were false, BART could have withheld payment and/or terminated the contract, while DOT could have imposed penalties including banning BART from participation in federal contracts. (Docket No. 53 at ¶ 110). Bombardier contends it did not make false reports because JRL's figures were not included in the percentage of planned award amounts versus the total plan. (Docket No. 46 at 13). However, based upon Mr. Deemer's testimony, there is evidence in the record that BART used the JRL numbers in the reports to evaluate Bombardier's overall DBE

compliance and in its reports to DOT. (Docket No. 53 at ¶ 106). Therefore, the Court finds that there are genuine issues of material fact as to whether Bombardier's submitted false DBE reports.

**B.      Materiality**

Bombardier next argues that there is no genuine issue that the false DBE reports did not materially affect BART's decision, and in turn the FTA's, to pay it for the renovation work on the rail cars. (Docket No. 46 at 13). Bombardier first relies on *United States ex rel. Berge v. Bd. of Trustees*, 104 F.3d 1453 (4th Cir. 1997) to support is materiality argument. In *Berge*, a FCA claim was brought by a graduate student against a university and three research professors claiming that they made false statements in their annual progress reports that sought funding from the National Institute of Health for research projects. *Berge*, 104 F.3d at 1455-56. The student alleged that the university plagiarized her work in its in application for funds, without crediting her, and thus made a false statement to get a claim paid. *Id.* at 1456. The jury's verdict in favor of the student was reversed on appeal as the court found that the student's work was not central to the overall project and that the university would have been awarded funding even without the student's research. *Id.* at 1462. This was because the National Institute of Health did not require the university to disclose the identity of research contributors and because the university had been receiving funding for nearly a decade before submitting the proposal in question. *Id.* It further held that there can be no FCA liability unless the defendant has an obligation to disclose omitted information. *Id.*

This case is readily distinguishable from *Berge*. Unlike the university in *Berge*, Bombardier was required to submit DBE reports as a prerequisite to being paid the full unit price per vehicle. Bombardier's argument that because it surpassed its DBE obligation before any of JRL's participation, therefore any report containing JRL figures was immaterial, misses the point. Section

P7.13J-L of the BART contract required Bombardier to submit complete and accurate monthly DBE reports regardless of the status of the overall DBE goal. (Docket No. 53 at ¶¶ 87-88). Failure to provide accurate reports gave BART discretion to terminate the contract or withhold payment due to Bombardier. (Docket No. 53 at ¶ 108). Unlike the insignificant nature of the student's work in *Berge*, Plaintiff has put forth evidence that the DBE reports played an important role in the BART contract and DOT's national DBE program. (*See* Docket No. 53 at ¶¶ 81, 84-85, 88, 107-110). Therefore, the Court finds there are disputed facts as to whether Bombardier's submission of false reports certifying compliance with its DBE requirements undermined the integrity of the DOT's national DBE program.

Further, despite Bombardier's position to the contrary, the actual effect of the falsity of the reports upon Bombardier's decision to pay is not controlling on the materiality issue. *Harrison*, 352 F.3d at 916. Rather, the focus is on the "potential effect of the false statement when it is made." *Id.* at 917. That is, a party will be held liable for a false statement or course of conduct "'if it has a natural tendency to influence agency action or is capable of'" influencing the government's funding decision, not whether it actually influenced the government. *United States ex. rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008)(quoting *Berge*, 104 F.3d at 1460); *see also Neder v. United States*, 527 U.S. 1, 16 (1999); and *Harrison*, 352 F.2d at 914 (quoting *Berge*, 104 F.3d at 1460).

Plaintiff has put forth evidence showing that the repairs were required under the warranty provision of the contract and were essential to Bombardier's right to payment of the unit price. (Docket No. 53 at ¶¶ 72-77). He has also supplied evidence that the BART-Bombardier contract could have been terminated and Bombardier could have been banned from future participation on

federal contracts by DOT had BART and DOT been aware of the incorrect information. (*Id.* at ¶ 110). Therefore, in this Court's estimation, contrary to Bombardier's suggestion (*see* Docket No. 46 at 16-17), JRL's participation on the project was significant. Absent JRL's work on the rail car repairs and work in preventing further defects, Bombardier would not have been paid the full unit price per vehicle. Thus, the false reports concerning the amounts awarded and paid to JRL could have had a natural tendency to influence or were capable of influencing BART's decision to pay Bombardier in the form of non-approval of payment and/or termination of the contract. *Harrison*, 352 F.2d at 914 (quoting *Berge*, 104 F.3d at 1460); *see also United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 412, 415 (3d Cir. 1999), *cert. denied*, 513 U.S. 880 (2000). Accordingly, the Court finds that there are questions of material fact as to the materiality of Bombardier's false DBE reports.

**C. Requisite Scienter**

While Bombardier has stated that the false report was an "honest mistake" and that there is no other evidence that the DBE reports contained any other inaccuracies or any deception on the part of Bombardier (Docket No. 46 at 6-7), it has not argued that there are no questions of fact as to the knowledge requirement under the False Claims Act. In his response to Bombardier's motion, however, Plaintiff has argued that there is sufficient evidence for a jury to find that Bombardier knew the reports were false or at a minimum that it acted with deliberate ignorance and reckless disregard. (Docket No. 48 at 16). Specifically, Plaintiff highlights the evidence regarding Ms. Simms' failure to certify that the reports were correct or make any effort to verifyt the false reports, despite her duty to do so. (*Id.* at 17). Thus, according to Plaintiff, there is sufficient evidence for the case to go to a jury regarding Bombardier's scienter. The Court agrees for the following reasons.

For purposes of the Act, the terms "knowing" and "knowingly" are defined with respect to information a person (1) has actual knowledge of; (2) acts in deliberate ignorance of the trust or falsity of; or (3) acts in reckless disregard of the truth or falsity of same. 31 U.S.C. § 3729(b); *see also Zimmer*, 386 F.3d at 241; *Cantekin*, 192 F.3d 402. This section specifically states that no proof of specific intent to defraud is required. *Id.* In other words, a plaintiff need not prove that a defendant had a financial motive to make a false statement relating to a claim seeking government funds. *See Harrison*, 352 F.3d at 921 (pointing out that the four elements of a FCA claim do not include financial motive). In applying these standards to the present record, the Court remains mindful of the rule that a defendant's state of mind typically should not be decided on summary judgment. *See, e.g., Hunt v. Cromartie*, 526 U.S. 541, 552-53 (1999); *Cantekin*, 192 F.3d at 411.

The United States Court of Appeals for the Fourth Circuit in *Harrison*, *supra*, held that the knowing requirement could be established by a showing that at least one employee knew or should have known that a false statement was being submitted to secure government funds. *Harrison*, 352 F.3d at 919. The legislative history supporting the 1986 amendments to the FCA indicates that the knowledge requirement addresses the "ostrich-like" effect of burying your head in the sand and refusing to learn information that an individual exercising reasonable judgment would have reason to know. S. Rep. No. 99-345, at 20-21 (1986), reprinted in 1986 U.S.C.C.A.N. 5266. Accordingly, a defendant will be held liable if it had constructive knowledge, that is, where it "turn[ed] a blind eye" to the false claim. *Id.* The standards as to reckless disregard or constructive knowledge have

been interpreted to be a linear extension of "gross negligence."[16] *United States v. Krizek*, 111 F.3d 934, 941 (D.C.Cir. 1997), *cert. denied*, 534 U.S. 1067 (2001). For purposes of the FCA, reckless disregard lies on a spectrum between gross negligence and intentional harm. *Id.* (citing *Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 668 (D.C. Cir. 1996)).

Here, it is undisputed that the DBE reports submitted between September of 2001 and November of 2002 overstated the amount awarded and paid to JRL by $2,397,045. This figure, Bombardier conceded, included the costs of equipment purchased by Bombardier. (Docket No. 47 at ¶ 34). Bombardier attests that these reports were a "honest mistake." (Docket No. 46 at 8). However, despite this contention, the Court finds questions of fact exist as to Bombardier's knowledge or reckless indifference to the veracity of its reports. Plaintiff has put forth evidence that Bombardier knew that these costs were not to be included in the DBE figures. (Docket No. 53 at ¶¶ 57, 96-97). Further, it is undisputed that the DBE reports were to be complete and accurate and that Ms. Simms was responsible for reviewing and verifying the reports before they were submitted. (Docket No. 47 at ¶¶ 45, 56; Docket No. 53 at ¶¶ 56, 92-93, 103, 109). Thus, as Plaintiff argues, a jury could find that there "is simply no possibility that Bombardier could have 'mistaken' the fictional payments." (Docket No. 48 at 18). Furthermore, the overstated amount paid to JRL could have been easily verified by Ms. Simms by referencing Bombardier's internal records. (*Id.*). There is no evidence that this was done before the reports were submitted to BART. As discussed above, Plaintiff has also shown that the inflated figures were used by BART and the DOT in evaluating

---

16 Gross negligence is defined as the "lack of slight diligence or care" or "a conscious, voluntary act or omission in reckless disregard of a legal duty." BLACK'S LAW DICTIONARY (8th ed. 2004)(Online edition).

overall DBE participation. (Docket No. 53 at ¶¶ 88, 105-106). These facts taken as a whole, the Court finds, are sufficient to create material questions of fact as to Bombardier's scienter.[17] As such, a reasonable jury could find that Bombardier acted recklessly or with deliberate indifference by failing to verify the incorrect DBE reports.

Moreover, once Bombardier learned of its mistakes, it could have rectified the same by notifying BART. However, there is no evidence that occurred here. An individual responsible for certifying the truth of a claim made to the government cannot turn a blind eye, rather, they must make the reasonable inquiries regarding claims that are being submitted. S. Rep. No. 99-345, at 20-21. Viewing the record evidence in the light most favorable to the Plaintiff and drawing all reasonable inferences in favor of him, there is sufficient evidence for a jury to conclude that Bombardier possessed the requisite scienter to be held liable under the FCA as Bombardier knew or could have known, through Ms. Simms, that the DBE reports were false when they were submitted to BART.[18]

**D.    Damages**

Bombardier argues that it cannot be liable under the False Claims Act because there is no evidence that the government sustained any loss as a result of the false DBE reports because the government "got what it paid for." (Docket No. 48 at 18, 20). Specifically, Bombardier argues, relying on *Ab-Tech Construction, Inc. v. United States*, 31 Fed. Cl. 429 (Fed. Cl. 1999), that any

---

17

The Court also notes Plaintiff's contention that in submitting the reports reflecting JRL's participation, Bombardier would have been mindful of the need to show DBE compliance given its experience with having at least one of the project's DBEs, i.e. Mindseed Corporation, decertified. (Docket No. 53 at ¶ 27).

18

This conclusion is consistent with the Fourth Circuit and Eleventh Circuit's opinions in *Harrison*, 352 F.3d 908, and *Grand Union Co. v. United States*, 696 F.2d 888 (11th Cir. 1983), which held that a corporation can be held liable under the FCA even if the verifying employee was unaware of the wrongful conduct of other employees.

false certification of compliance it may have made regarding DBE participation figures did not cause the government economic harm because Bombardier absorbed the costs for JRL's work. (Docket No. 46 at 20). Bombardier did not invoice BART for payments it made to JRL and did not receive additional payment when the defective motors were returned to BART repaired. (*Id.* at 21-22). Therefore, Bombardier contends, there are no issues of fact regarding actual damages because the government and BART were not harmed by the false reports as BART received fully functional cars at the end of the project. (*Id.* at 23). Bombardier does concede, however, that when it returned these vehicles to BART, it received payment from BART for the unit price for the work listed in the BART contract. (*Id.*).

In response, Plaintiff argues that Bombardier's overstatements did cause actual harm by serving to undermine the BART and DOT DBE programs. (Docket No. 48 at 19). The FTA was paying BART for compliance with the DBE program, regardless of whether Bombardier had met the contract goal. (*Id.*). Bombardier's false reports undermined the DBE program making the government pay for something it was not getting, that is, compliance with a program that is set up as a condition to the award of and participation in federal contracts. (*Id.*). Further, Plaintiffs argues, Bombardier did not receive the full unit price for the vehicles until they were complete and fully functional. (*Id.* at 19-20). Plaintiff thus attests that JRL's work on the cars was significant to Bombardier's right to receive payment. (*Id.*). He also points out that the BART contract provides BART the right to liquidated damages in the event of Bombardier's failure to file DBE reports. (Docket No. 48 at 20).

Under the False Claims Act, damages are not a necessary element for a successful claim. *Rex Trailer Co. v. United States*, 350 U.S. 148, 152-53 (1956); *United States v. Miller*, 645 F.2d 473 (5th

Cir. 1981). "Recovery under the [FCA] is not dependent upon the government's sustaining monetary damages." *Hutchins*, 253 F.3d at 183 (citation omitted). Therefore, there may be FCA liability even where the government suffered no injury. *United States See ex rel. Sanders v. American-Amicable Life Ins. Co.*, 545 F.3d 256, 159 (3d Cir. 2008)(holding same but finding the FCA inapplicable because no claim was made to the government). Additionally, the Court notes that the mere fact that the government chose not to intervene in no way demonstrates that it did not consider Bombardier's statements to be false, or that it "received exactly what it paid for." *United States ex rel. King v. F.E. Moran, Inc.*, Civ. A. No. 00-c-3877, 2002 U.S. Dist. LEXIS 16277, at *31-32 (N.D. Ill. Aug. 29, 2002). If it did, the statutory provision permitting relators to pursue this type of action would be superfluous. *Id.* (citation omitted).

Under the Act, it is the *qui tam* relator's burden to prove damages, as he stands in the place of the government. 31 U.S.C. § 3731(c). When the government has not suffered any actual monetary detriment, then the government is limited to the imposition of statutory penalties provided for under the FCA. *Ab-Tech*, 31 Fed. Cl. at 434-35.

In this Court's estimation, there is sufficient evidence upon which a jury could find that DOT and BART expected Bombardier to meet the DBE goals as set forth in the contract and to submit accurate reports because such reports would be used to evaluate the DBE program on a national level. If Bombardier's JRL figures were incorporated into DOT's and BART's cumulative DBE program totals, then the government was harmed in that it reimbursed BART for payments to Bombardier even though its DBE program was being undermined by false certification of compliance with DBE regulations. *See, e.g.,King*, 2002 U.S. Dist. LEXIS 16277, at *32 (government clearly expected defendant to meet MBE contract goals and was harmed when

defendant undermined its MBE program). Therefore, the Court finds that there are genuine issues of material fact as whether the government suffered actual harm by virtue of the claimed damage to the DBE program and Bombardier's overstatement of DBE participation by $2,397,045. The Court further finds that even if a jury were to conclude that the government did not suffer actual harm, statutory damages may still be appropriate, calculated on a per false claim basis as provided by 31 U.S.C. § 3729.

**E. Plaintiff's California False Claims Act Claim**

Bombardier lastly argues that Plaintiff's California False Claims Act claim under Cal. Gov. Code §12650, *et. seq*. must fail because this Court lacks independent subject matter jurisdiction over said claim as Plaintiff's federal False Claim Act fails. (Docket No. 46 at 23). Bombardier contends that absent some other basis for federal subject matter jurisdiction, given its further contention that there is none, a determination of whether there was a violation of the California FCA is best left to the California state courts. (*Id.* at 24).

Section 3732(b) of the False Claims Act provides that the district courts "shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as the action brought under section 3730." 31 U.S.C. § 3732(b). Further, the United States Supreme Court has held that federal courts have the power to hear state law claims that "derive from a common nucleus of operative fact" with substantive federal claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *see also Shaffer v. Bd. of Sch. Dir. of Albert Gallatain Area Sch. Dist.*, 730 F.2d 910, 911-12 (3d Cir. 1984). For the reasons that underlie this Court's denial of Bombardier's motion for summary judgment, the state law claims pled by Plaintiff should be determined by a jury. Therefore,

the Court will retain jurisdiction over Plaintiff's state law claims.

## VI. Conclusion

For the foregoing reasons, Bombardier's Motion for Summary Judgment (Docket No. [45]) is **DENIED** as there are genuine issues of material fact as to whether Bombardier made false reports concerning their DBE utilization goals to BART with the requisite scienter and as to whether those reports materially influenced BART's decision to pay Bombardier for its work on the rail car motors involved. An appropriate order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: March 23, 2009.
cc/ecf: All counsel of record.